## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| NOEL LUGO ESTRADA<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL NO.: 14-1711 (MEL) |

### MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

### I.   PROCEDURAL HISTORY

On September 18, 2014, Noel Lugo Estrada ("Lugo") filed a complaint against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq*. ECF No. 1. Plaintiff alleges that the United States, through a hospital run by the Department of Veterans Affairs and its staff, breached their duty of care. Id.

This case was tried before the court and without a jury on June 20, 2016. ECF No. 42. Both parties submitted post-trial briefs on July 5, 2016. ECF Nos. 44–45. Upon consideration of the evidence presented at trial, the post-trial memoranda, and the entire record in this case, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

### II.   LEGAL STANDARD

Pursuant to the FTCA, the United States waives its sovereign immunity "for certain torts committed by federal employees." F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994). The FTCA vests district courts with the:

> exclusive jurisdiction of civil actions against the United States, for
> money damages . . . for injury or loss of property, or personal

> injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); see Santiago–Ramírez v. Secretary of Dep't of Defense, 984 F.2d 16, 17 (1st Cir. 1993). In the present case, there is no dispute that all relevant events transpired in Puerto Rico; therefore, Puerto Rico law governs plaintiff's claims. 28 U.S.C. § 1346(b).

To prevail on a medical malpractice claim under Puerto Rico law, a plaintiff must establish: "1) the duty owed, 2) an act or omission transgressing that duty, and 3) a sufficient causal nexus between the breach and the harm." Rojas–Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia, 394 F.3d 40, 43 (1st Cir. 2005). In medical malpractice cases, hospitals are liable for the negligent acts or omissions of their physicians under three legal theories. See Casillas Sánchez v. Ryder Memorial Hosp., Inc., 960 F.Supp.2d 362, 365 (D.P.R. 2013) (citing Márquez Vega v. Martínez Rosado, 116 D.P.R. 397, 16 P.R. Offic. Trans. 487 (1985)). Under respondeat superior, negligence on the part of the employees, medical staff, or agents is imputed to the hospital. Id. Under the doctrine of corporate negligence, "a hospital may be liable for the negligent acts of a physician who was merely granted the privilege of using the hospital's facilities for his or her private patients." Id. Under the doctrine of apparent agency, a hospital is liable for the negligent acts of a physician "when a patient first comes to a hospital in search of help and he or she understands, or is given the impression that all the medical staff attending him or her is employed by the hospital, regardless of whether or not it is." Id. (internal quotations and alterations omitted).

### III.   FINDINGS OF FACT

#### A.  General Facts

A significant amount of the facts of this case were uncontradicted on the record at trial and, upon consideration of all evidence properly before the court, are adopted as follows.[1]

On the evening of September 26, 2011, Lugo experienced a fall on his bike, which injured his right shoulder. The following day Lugo's sister took him to the San Juan Veterans Affairs Hospital ("VA Hospital") emergency room ("ER"). Lugo was in pain at the time. X-rays of the right shoulder were taken that revealed a type III acromioclavicular joint dislocation.[2] He was given an injection for pain, a prescription for additional pain medication, and a referral to an orthopedic specialist after his arm was placed in a sling. Lugo was subsequently discharged the same day.

Pursuant to the referral, Lugo visited Dr. Francisco Otero López ("Dr. Otero"), an orthopedic surgeon at the VA Hospital, on October 4, 2011.[3] X-rays were again taken that showed the type III acromioclavicular joint dislocation. At an appointment with Dr. Ortero on October 25, 2011, Lugo's sling was removed, and physical therapy was recommended. Lugo was

---

[1] As no transcript was available at the time of entering this order, all citations are to the official court recording.
[2] The parties used "grade III" and "type III" interchangeably when referring to Lugo's diagnosis. The term "type III" will be adopted herein.
[3] Dr. Otero did not testify in this case. During the pretrial and settlement conference, defendant informed that Dr. Ortero would be out of Puerto Rico during the week of the trial, but that he would be the defense's final witness. In light of this representation, the court stated, "the most the court will wait to hear his testimony is until June 27, 2016 at 9:00 am. Otherwise, he will not be allowed to testify." ECF No. 27. After the presentation of the final expert witness at trial on June 20, 2016, defendant was specifically asked whether it was resting its case. Defendant responded, "the defendant rests." Trial, at 5:06 PM. After closing argument was heard from both sides, defendant stated that he "stand[s] corrected" because he had intended to present the testimony of Dr. Otero. Trial, at 5:19 PM. The court construed this as a motion to reopen the trial, which was denied. Defense counsel then stated that "the defense does not submit this case to the court." Trial, at 5:25 PM. The court reiterates here that because defendant had rested its presentation of evidence and made closing arguments, the case is properly considered submitted. Defendant's objection is thus overruled.

referred for a physical therapy appointment on December 7, 2011, but did not attend.[4] Ex. I, at 528.

On January 12, 2012, Lugo fell in the bathroom and injured his right knee. Lugo returned to the VA Hospital ER on January 17, 2012 for evaluation of his knee. X-rays of both the right shoulder and knee were taken on March 13, 2012. The shoulder injury was then recorded as having progressed to a type V acromioclavicular joint dislocation. It was at this appointment on March 13, 2012, that a VA Hospital doctor first recommended Lugo for shoulder surgery, and Lugo assented. Lugo did not attend his subsequent physical therapy appointment on March 19, 2012. Ex. I, at 490.

Lugo again presented to the VA Hospital ER on February 7, 2013 with complaints of right knee pain. He was scheduled for an appointment with the orthopedic surgery service on April 1, 2013, but did not attend. Ex. I, at 454. Ultimately, surgery on Lugo's shoulder was performed on May 1, 2013.

### B. Acromioclavicular Joint Dislocation

There was disagreement amongst the parties' experts regarding what is anatomically occurring in an acromioclavicular joint dislocation and what the reality of that injury looked like in the physiology of Lugo. This issue relies heavily on the testimony of the medical experts.

Plaintiff offered Dr. Frank A. Rodríguez Serrano ("Dr. Rodríguez"), who currently specializes in pulmonary diseases, as an expert in emergency room medicine.[5] Prior to trial, defendant filed a motion in limine to exclude the testimony of Dr. Rodríguez that was held in abeyance to be ruled upon at trial. ECF No. 27. A lengthy voir dire was conducted at trial by

---

[4] Lugo originally testified that he went to every single physical therapy session, but later conceded that he missed "a few." Trial, at 9:40 AM. To corroborate which appointments were missed, citations to the medical record are included. Lugo's medical record was submitted as a joint exhibit, and neither party has raised any allegation that the notations contained therein are inaccurate.

[5] Plaintiff stipulated in advance of the trial that pulmonology was not relevant to this case. ECF No. 25, at 1.

both the parties and the court. Dr. Rodríguez's curriculum vitae ("CV") differed substantially and materially from his testimony regarding his qualifications during trial.

Multiple institutions that Dr. Rodríguez listed as places of employment in his CV, including Metropolitan Hospital in Arecibo, PR, and Loíza Valley Medical Center in Canóvanas, PR, were not mentioned as places of employment in the exhaustive voir dire. Conversely, multiple institutions at which Dr. Rodríguez testified to having significant emergency room experience were not identified in his CV. Dr. Rodríguez testified that he worked in the emergency room of the Utuado Hospital (which he stated was later called Metropolitan Utuado) every other week for approximately fifteen hours a week between the years 1996 and 2000. No hospital located in Utuado, Puerto Rico or named either Utuado Hospital or Metropolitan Utuado was included in his CV. According to his testimony, from the years of 1991 and either 1994 or 1995, Dr. Rodríguez worked at the Metropolitan Hospital in Río Piedras, Puerto Rico as an Emergency Room Physician approximately twenty-four hours a week. The CV does include a "Metropolitan Hospital," but lists the location as Arecibo, Puerto Rico and his title Attending Pulmonary Physician and Consultant. ECF No. 25-2, at 1.[6] Dr. Rodríguez testified that he also regularly worked in the emergency room at the Hato Rey Community Hospital between 1987 and 1990. Again, no employment at Hato Rey Community Hospital was disclosed in the CV. In one striking instance of the discrepancy between Dr. Rodríguez's testimony and his CV, the institution name, years worked, and his position title all changed with respect to one position. In his CV, Dr. Rodríguez listed himself as Medical Director Pulmonary Disease at San Geraldo Hospital Medical Center between August 1994 and June 2006. ECF No. 25-2, at 2. In his testimony, however, Dr. Rodríguez listed himself as the Chief of the Respiratory Therapy

---

[6] The pagination of this document begins with the number "2." For clarity of the record, citations herein are made to the pagination produced by the CM/ECF system and stamped on the top of every page.

Department, Sub-director of the Intensive Care Unit, and Pulmonary Consultant at San Gerardo Rehabilitation Center between 1991 and 2000. Even if these are actual separate and distinct positions and institutions that would still mean that Dr. Rodríguez only listed the Hospital Medical Center on his CV and omitted it from his testimony, while omitting the Rehabilitation Center from his CV but including it only in his testimony. While a CV is not expected to contain every place of employment that a putative expert has ever held, Dr. Rodríguez's CV omitted institutions at which he had significant experience relevant to the field of expertise for which he was tendered.[7] In fact, the only mention of emergency room medicine in Dr. Rodríguez's CV occurs between the years of 1984 and 1986, during which the CV indicated he worked as an Emergency Room Attending Physician at both Elmhurst Hospital Medical Center and Mount Sinai Medical Center in New York.

It is the trial judge's role as gatekeeper to ensure that expert testimony rests on a reliable foundation. Pages Ramírez v. Ramírez González, 605 F.3d 109, 113 (1st Cir. 2010). "In carrying out this responsibility, the trial court must bear in mind that an expert with appropriate credentials and an appropriate foundation for the opinion at issue must be permitted to present testimony as long as the testimony has a 'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Id. at 115 (quoting Fed. R. Evid. 401). "Although credentials such as board certification in a particular medical specialty may indicate that an expert's opinion is 'entitled to greater weight,' such certification has 'never been held a prerequisite to qualification as an expert medical witness.'" Pages-Ramírez, 605 F.3d at 113-14 (quoting Alvarado v. Weinberger, 511 F.2d 1046, 1049 (1st Cir.1975) (per curiam)). Rather the court determines

---

[7] An additional concern, although it was not objected to by defendant, is that Dr. Rodríguez indicated that he prepared for this case by doing his research and "ask[ing] a couple of orthopedic colleagues." Trial, at 2:04 PM. These colleagues and the nature of the consultation was never revealed.

whether an expert is qualified by the factors identified in Federal Rule of Evidence 702: knowledge, skill, experience, training, or education. Id., at 114.   Therefore, despite all the irregularities between the CV and his testimony, the court looked at the actual experience and credentials of Dr. Rodríguez to determine whether he was qualified to testify as an expert.[8]

It was undisputed that Dr. Rodríguez was not board certified in any field of medicine. Dr. Rodríguez testified to treating at least two shoulder dislocations and over seventy shoulder fractures throughout his career. Furthermore, he testified to working emergency room shifts on a weekly or biweekly basis since 1987 to the present. This is sufficient experience in emergency room medicine to satisfy admissibility requirements of Federal Rule of Evidence 702. Thus, after clarifying for the record that the court relied only on the positions testified to in court and at which he had emergency room experience, Dr. Rodríguez was admitted as an expert in emergency medicine and the motion in limine to exclude his testimony (ECF No. 20) was denied.

The court then heard Dr. Rodríguez's substantive testimony. Dr. Rodríguez testified that a type III acromioclavicular joint dislocation "means that the head of the humerus comes out of the glenoid cavity, which is in the scapula, and it goes anterior, displaces anterior and inferior to the joint, to the actual shoulder joint." Trial, at 1:39 PM.   When asked to explain "how this humerus and the socket works," Dr. Rodríguez testified that it is like a "ball joint articulation." Trial, at 1:42 PM.

---

[8] As the court noted at trial, this problematic disclosure is likely sanctionable pursuant to Federal Rules of Civil Procedure 26 and 37. Defendant, however, moved only under the Federal Rule of Evidence 702 on the grounds that plaintiff's expert report was not based on sufficient fact or data and was not the product of reliable principles and methods. This rule merely provides for the exclusion of evidence if a putative expert is not qualified to give expert testimony or if the testimony itself is deficient such that it is unreliable. Defendant never moved under Civil Rule of Civil Procedure 26 on the basis that plaintiff's expert disclosures were patently insufficient or requested sanctions under the same.

Defendant offered two experts, Dr. Carlos Grovas Badrena ("Dr. Grovas") and Dr. Eric Javier ("Dr. Javier"). Dr. Grovas completed a fellowship in surgery of the hip, shoulder, and knee at the Harvard affiliated hospitals in Boston, Massachusetts, has worked as an orthopedic surgeon for fourty-two years, and is currently the Chief Orthopedic Surgeon at Pavía Hato Rey Hospital, a position he has held for thirty two years. He has published work in the orthopedic field, has lectured in his field for forty years, and is an instructor *ad honorum* at the Puerto Rico School of Medicine. Dr. Grovas was thus duly admitted as an expert in the field of orthopedic surgery with no objection from the plaintiff. Dr. Grovas went on to testify that the injury Dr. Rodríguez described and the injury suffered by Lugo are "apples and oranges." Trial, at 4:51 PM. According to Dr. Grovas, there was "no record, radiologically speaking, of any shoulder dislocation. The shoulder did not go out of the socket." Trial, at 4:43 PM. Rather the type III acromioclavicular dislocation meant that Lugo's collar bone went up and out of joint. It was the collar bone that dislocated.

Dr. Javier, defendant's second expert, completed a residency in physical medicine and rehabilitation at the State University of New York at Buffalo and has practiced as a physiatrist for sixteen years. He currently operates his own physical medicine and rehabilitation clinic where, amongst other things, he treats orthopedic patients for rehabilitation after surgery or acute trauma. Dr. Javier was accordingly admitted as an expert in the field of physiatry without objection. Dr. Javier, like Dr. Grovas, testified that Dr. Rodríguez's testimony was "based on a diagnosis and an injury that never happened." Trial, at 3:22 PM. Dr. Javier testified that Lugo never had a glenoid humeral dislocation, but only had the acromioclavicular dislocation. Dr. Javier described the injury as when the ligament between the coracoid process ruptures or stretches and the clavicle "pops up." Trial, at 3:09 PM. Dr. Javier specifically cited to a

8

radiological report dated October 4, 2011 that states "[t]here is acromioclavicular separation, upward displacement of the distal end of the clavicle due to dislocation." Ex. I, at 709.

Ultimately, plaintiff appears to have conceded that Dr. Rodríguez testified regarding an incorrect understanding of the diagnosis. In his post-trial brief, he stated, "Plaintiff's expert witness, Dr. Rodríguez-Serrano, although mistaken as to the shoulder dislocation, that is, socket displacement versus acromioclavicular dislocation, testified about the severity of plaintiff's injury and the resulting pain." ECF No. 45, at 3. Additionally, the weight of the evidence on this issue is against plaintiff. Dr. Rodríguez is a pulmonologist, who covers shifts in the emergency room when other doctors are not available. Dr. Rodríguez testified that he treated two shoulder dislocations between 1991 and either 1994 or 1995 and "a few" shoulder dislocations between 1984 and 1986. These were the only shoulder dislocations that Dr. Rodríguez testified to treating. On the other hand, Dr. Grovas has served as Chief Orthopedic Surgeon for three decades, had treated seventy to seventy five individuals with injuries similar to Lugo's injury, and currently treats approximately twenty patients with a type V acromioclavicular dislocation alone. Therefore, the court affords great weight to his opinions regarding orthopedic treatment and surgery, specifically with respect to acromioclavicular dislocation. Dr. Javier specializes in physical medicine and rehabilitation, including the treatment of orthopedic injuries following acute trauma, but gave no specifics with respect to his treatment of these types of injuries. To the extent his opinion is consistent with that of Dr. Grovas, it is also accorded significance.

Therefore, taking into consideration the testimonial and documentary evidence, coupled with the concession in plaintiff's brief, the court finds that Lugo initially experienced a type III acromioclavicular dislocation resulting in an upward displacement of his clavicle.

Dr. Rodríguez's theory that the humeral head was displaced out of the glenoid socket is given no weight.

**IV.    CONCLUSIONS OF LAW**

In order to prevail on his medical malpractice claim, plaintiff must prove that the VA Hospital (or its employees) breached the standard of care in either the initial treatment of Lugo's acromioclavicular dislocation or in the one year and seven month delay between the initial presentation of the injury and his surgery.[9] A healthcare provider has a duty to use "the same degree of expertise as could reasonably be expected of a typically competent practitioner in the identical specialty under the same or similar circumstances, regardless of regional variations in the professional acumen or level of care." Rolón–Alvarado v. Municipality of San Juan, 1 F.3d 74, 77–78 (1st Cir. 1993). Under Puerto Rico law, "there exists always a presumption that the treating physicians have observed a reasonable degree of care . . . in the process of giving medical attention and treatment." Rolón–Alvarado, 1 F.3d at 78 (quoting Del Valle Rivera v. United States, 630 F.Supp. 750, 756 (D.P.R.1986)). "It is the plaintiff's obligation to refute this presumption by adducing evidence sufficient to show both the minimum standard of care required and the physician's failure to achieve it." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 7 (1st Cir. 2010). "Naturally, the trier of fact can rarely determine the applicable standard of care without the assistance of expert testimony." Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994).

A.  Statements of Standards of Care

Plaintiff's evidence points to three potential deviations from the standard of care: not reducing or relocating the dislocation within twenty four hours to three weeks following the initial injury, placing the arm in a sling rather than a splint, and waiting approximately nineteen

---

[9] Plaintiff conceded that he was not challenging the standard of care used in the surgery itself.

months before performing surgery.[10] Defendant contends, as an preliminary matter, that Dr. Rodríguez only testified "as to his personal or subjective opinion" without identifying "what should have been the proper standard of medical care in this case." ECF No. 44, at 4. It is correct that Dr. Rodríguez mostly testified regarding what he "would have done" to treat Lugo,[11] what "could have been done" to treat him,[12] and what would have been "more reasonable."[13] It is "insufficient for a plaintiff in a malpractice case merely to show that another doctor would have chosen to treat the patient in a manner different from the manner in which the attending physicians treated him." Rolón-Alvarado, 1 F.3d at 78. The first step must then be looking at Dr. Rodríguez's statements regarding each of the three alleged deviations and assuring they rest on affirmative statements of the standard of care, rather than mere alternative treatment routes.

It must next be determined whether these standards of care survive the finding that Lugo never experienced a humeral glenoid socket dislocation, but only a dislocation of the clavicle. Plaintiff argues that despite a mistake in diagnosis, Dr. Rodríguez's opinion should nevertheless be credited. ECF No. 45, at 3. "An expert opinion grounded on a nonexistent fact," however "is not sufficiently probative." Borges, 605 F.3d at 8. Any standards of care grounded on a socket dislocation will thus be disregarded as insufficiently probative of the standard of care for a

---

[10] Throughout the trial plaintiff referred to the elapsed time as "twenty months." The time between the initial injury on September 26, 2011 and the date of the surgery on May 1, 2013, is actually nineteen months and five days. Whether the time elapsed was nineteen or twenty months irrelevant to the analysis; however, the court will use the more accurate nineteen month approximation.

[11] When asked on cross examination, whether he was saying that the shoulder "should have been relocated and/or reduced within the 24 to 48 hours after the accident," Dr. Rodríguez responded, "Ideally, yes." Trial, at 2:00 PM. Upon being asked to clarify what ideally meant, Dr. Rodríguez testified that "Ideally means *I would have done that. If it comes to me and its my choice, I would have done it.*" Id (emphasis added).

[12] "In my experience, if there are no associated complications like associated fractures, ligamental tears, or any complication on experienced and expert hands the relocation *could have been done* within minutes . . . ." Trial, at 1:38 PM (emphasis added).

[13] "*The more reasonable thing* is to put it where it belongs unless you have complications that you can probably under special circumstances put a special splint and sling so that you can within the next two or three weeks schedule surgery." Trial, at 1:44 PM (emphasis added).

acromioclavicular joint dislocation. If the opinion of Dr. Rodríguez survives this inquiry, it must then be weighed along with the entirety of the evidence.

i.   *Reduction or Relocation*

Dr. Rodríguez testified that reducing or relocating the joint within "twenty four to forty-eight hours and three weeks" is what "should have been done" and what he "would have done." Trial, at 2:12 PM. Dr. Rodríguez further testified that relocation "is advisable," which he clarified meant "it should have been done." Trial, at 1:44 PM & 2:04 PM. Although not the model of clarity, this statement goes beyond proposing alternative treatment and is sufficiently objective to constitute a statement of a standard of care.

According to Dr. Rodríguez relocation should be performed in this timeframe "since the longer you keep the head of the humerus against the . . . chest or the brachial plexus or any nerve that goes from under the axillary area to the chest, it can compromise movement, it can compromise vascularity, it can compromise the nerves, the motion." Trial, at 1:44 PM. It is apparent from the plain language that Dr. Rodríguez's expressed standard relies on the belief that the humeral head was displaced from the glenoid socket. Therefore, this expressed standard for the treatment of humeral dislocations is not relevant to determining the appropriate standard of care in this case. There is no testimony on the record regarding whether a clavicle dislocation can be reduced or relocated or what the time frame for such treatment should be.[14] Plaintiff failed to meet his burden of showing that not reducing or relocating the acromioclavicular dislocation within three weeks was medical malpractice.

---

[14] Dr. Javier did testify that Lugo's shoulder never required manipulation; however, there was no clarification as to what manipulation entails and whether it is comparable to reduction and relocation.

ii.    *Arm Sling*

Next, according to Dr. Rodríguez rather than placing Lugo's arm in a sling, the standard of medical care is to place the arm in a splint. When asked on cross examination whether putting a sling on Lugo's arm was against the standard of medical care, Dr. Rodríguez responded, "no, that is the standard, but not a sling, you have to put a splint." Trial, at 2:06 PM. Again, although Dr. Rodríguez's statement is not absolutely pellucid, it is sufficient to constitute an affirmative statement of the standard of care.

Dr. Rodríguez explained that a splint differs from a sling because it "keeps the arm in a special position and puts between the upper part of the humerus and the chest like a cushion . . . to keep it away from the chest wall and from the nerves of the brachial plexus and the axillary vasculature." Trial, at 1:45 PM. Specifically, he testified that if complications prevent the relocation, "you can probably under special circumstances put a special splint and sling so that within the next two three weeks schedule surgery." Trial, at 1:44 PM. Dr. Rodríguez further testified that "if the initial encounter doesn't know how to perform [the relocation] and there's no [sic] someone that knows to do the technique, you can wait probably a week, but you have to make sure that the humeral head is not against the chest and for that you don't only give a sling, you have to put a splint . . . " Trial, at 1:45 PM. These statements by their own terms rely on the belief that the humeral head was dislocated from the socket. Dr. Rodríguez did not testify regarding whether a splint is required when the clavicle is displaced upward as occurred with Lugo.

On this issue, defendant's experts were in agreement. Both experts testified that providing Lugo a sling was the standard of care for a type III acromioclavicular dislocation. Dr. Javier testified that a shoulder dislocation would require more support, but that the

13

acromioclavicular dislocation is treated with the sling. According to Dr. Grovas, if the patient can tolerate the pain, a sling is not actually necessary.

The treating physician is afforded a presumption that employing a sling accorded with the standard of care. See Rolón–Alvarado, 1 F.3d at 78. Not only does Dr. Rodríguez's testimony not suffice to overcome that presumption, but the weight of the testimony of defendant's experts' unified conclusion that the sling was the appropriate treatment supports a finding that there was no medical malpractice.

###### iii.  *Interval Between Injury and Surgery*

Third and finally, when asked how long the injury should go before surgery, Dr. Rodríguez testified, "I'm not again absolutely sure, but I would say the less suffering, the faster, the better. I would say two, three weeks, less than a month." Trial, at 1:54 PM. Further, Dr. Rodríguez testified that waiting 20 months after the initial injury to perform the surgery is "not reasonable." Trial, at 1:56 PM. Testifying that a course of care is not reasonable is more than a mere disagreement about treatment options and constitutes an assertion of the standard of care. Cf Rolón-Alvarado, 1 F.3d at 78 ("the Puerto Rico Supreme Court has held that even an acknowledged error in medical judgment cannot support a malpractice claim so long as the mistake is reasonable."). As a threshold matter, however, it is not clear that this opinion is within the scope of the expertise for which Dr. Rodríguez was tendered and admitted as an expert.[15] Dr. Rodríguez was admitted as an expert in emergency room medicine. Accepting Dr. Rodríguez's assessment, the surgery is not something that would need to happen urgently upon presentation to the emergency room, but could wait as long as three weeks. Dr. Rodríguez also conceded that he is not able to state the standard of care that an orthopedic surgeon would be

---

[15] This opinion is also entirely absent from Dr. Rodríguez's expert report. See ECF No. 25-1.

required to follow.  Moreover, plaintiff has not alleged any basis for concluding that this testimony was within the scope of Dr. Rodríguez's expertise.

Even if the court assumes that Dr. Rodríguez was testifying within his expertise, it again appears that his opinion is based on an injury that never occurred. Dr. Rodríguez testified that "there is no way I can reason a dislocation for twenty months unless you have a scheduled before time surgery, you are compromising vasculature, he can even lose his extremity, he can experience numbness, then you can lose your movement, your blood doesn't get there, you're going to risk adhesions from the axillary artery." Trial, at 2:10 PM. Although this description does not specifically make reference to the humerus or the socket, Dr. Rodríguez's reasoning is parallel to the reasoning he employed above with respect to the need for a splint. In discussing the need for a splint, Dr. Rodríguez asserted that a splint keeps the humeral head away from the chest wall, because a humeral head pressed against the chest wall, brachial plexus, or axillary vasculature  "can compromise movement, it can compromise vascularity, it can compromise the nerves, the motion." Trial, at 1:44 PM. Further, Dr. Rodríguez never expressly linked any of these potential complications to the upward displacement of the clavicle.   In fact, when Dr. Rodríguez testified regarding the surgery that was eventually performed, it was evident that he was basing his understanding not on a clavicular injury but on the perceived humeral injury. Dr. Rodríguez testified that the surgery "did put it in place, but the shoulder was deformed" requiring them to do "special surgery" on the clavicle.  Trial, at 1:57 PM.

Defendant's experts, on the other hand, were unified and decisive in their opinion that there was no deviation from the standard of care in the timing of Lugo's surgery. Dr. Grovas testified that unless the patient is a high performance athlete, acromioclavicular dislocations are only operated on if in "the long run" the patient has disfigurement that they wish to improve and

experiences pain. Trial, at 4:45 PM. The standard of care with respect to a type III acromioclavicular dislocation, according to Dr. Grovas, is to wait a year or eighteen months before scheduling surgery. Dr. Grovas opined that when the injury progresses to type V and the individual has pain, surgery should then be scheduled as soon as possible. Dr. Grovas explained that, although Lugo's condition was upgraded to type V in February of 2012 and he was recommended for surgery on March 13, 2012, the fact that surgery was not conducted until over a year later was not error. This is because, in Dr. Grovas's view, Lugo first did not attend his follow up appointment after surgery was recommended and then injured his knee. Dr. Grovas testified that the knee injury was prioritized as more urgent than the older shoulder injury. Thus, Dr. Grovas concluded that the one year delay did not deviate from the standard of care. When asked to explain the delay between initial injury and eventual surgery, Dr. Javier also highlighted that Lugo did not attend his follow up appointment after being recommended for surgery and that his visits to the VA Hospital after that missed appointment were with complaints of knee pain, not shoulder pain. If a patient does not complain of pain, according to Dr. Javier, the patient will not be scheduled for surgery.

Dr. Grovas is the only expert here that is an orthopedic surgeon. Therefore, the court gives greater weight to his opinion regarding the appropriate timing of an orthopedic surgery. Dr. Grovas conclusively stated that the standard of care was at all times followed in this case, including in the timing of the surgery. Again after weighing Dr. Rodríguez's opinion against the highly credited opinion of Dr. Grovas and that of Dr. Javier, the plaintiff has not proven any medical malpractice here.

## V.    CONCLUSION

Taken together, the entirety of Dr. Rodríguez's testimony was based on a nonexistent dislocation of the humeral head from the glenoid socket. His conclusions are thus not sufficiently probative to outweigh the presumption that adequate care was given in the treatment of Lugo's acromioclavicular dislocation. This alone supports a finding against plaintiff. Even if Dr. Rodríguez's findings regarding standard of care were not manifestly irrelevant, they would still be outweighed by the opinions of defendant's experts.[16]  Plaintiff, both at the trial and in the post-trial briefing, makes much of the fact that, regardless of the original injury actually experienced, the record supported that plaintiff experienced some amount of pain after his injury, potentially up to and after the surgery. Tort law, however, does not make a doctor "an insurer of his patient's well-being." Rolon- Alvarado, 1 F.3d at 78. The mere existence of pain does not, on the facts of this case, demonstrate that any of the medical treatment was flawed. Plaintiff has not shown that the VA Hospital's treatment of Lugo at any point deviated from the standard of medical care, which is a required element of a medical malpractice claim.

---

[16] Because Dr. Ortero did not testify at trial, plaintiff requests the application Puerto Rico Rule of Evidence No. 304 that voluntarily suppressed evidence shall be deemed adverse. Even in diversity jurisdiction cases, however, the Federal Rules of Evidence, not the state's rules, apply. See Cameron v. Otto Bock Orthopedic Industry, Inc., 43 F.3d 14, 17–18 (1st Cir. 1994). The parallel to what plaintiff is requesting in federal jurisprudence is the missing witness instruction. "The decision of whether to give a missing witness instruction is 'committed to the sound discretion of the trial court.'" Steinhilber v. McCarthy, 26 F.Supp.2d 265, 179 (D. Mass 1998) (quoting United States v. Martínez, 922 F.2d 914, 924 (1st Cir. 1991). "When deciding whether to issue a missing witness instruction the court must consider the explanation (if any) for the witness's absence and whether the witness, if called, would be likely to provide relevant, non-cumulative testimony." Latin American Music Co. v. American Soc. of Composers Authors and Publishers, 593 F.3d 95, 102 (1st Cir. 2010) (internal quotations omitted). Here, although defendant accidentally overlooking that it had an additional witness, as discussed above, was not sufficient to justify reopening the trial, the court does find this explanation credible. Additionally, plaintiff presents no argument as to how Dr. Ortero's testimony would be non-cumulative. Each of the experts that testified here had the opportunity to review Dr. Ortero's treatment records. After this review, each of defendant's experts, whose opinion the court has credited, testified that Dr. Ortero's treatment did not deviate from the standard of care. Therefore, no negative inference will be drawn from Dr. Ortero's absence.

In light of the foregoing, defendant is NOT LIABLE on all claims herein.[17]

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 25th day of August, 2016.

s/Marcos E. López
U.S. Magistrate Judge

---

[17] Any pending motions are accordingly moot.